**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| BRIAN KLECKNER and JUANITA KLECKNER, | |
| Plaintiffs, | No. 17-cv-1032-MAR |
| vs. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RULING** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

_____

This civil action came on for a bench trial on May 13, 2019. The parties unanimously consented to trial, disposition, and judgment by a United States Magistrate Judge with appeal to the Eighth Circuit Court of Appeals pursuant to 28 U.S.C. Section 636(c)(1). The case was originally referred to then Chief Magistrate Judge Williams. (Doc. 9.) It was subsequently referred to me. At the request of the parties, I bifurcated trial into a liability phase and a damages phase. (Doc. 19.) The trial on liability proceeded on May 13, 2019. I submit the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

### I. STIPULATED FACTS.

The parties have stipulated that the following facts are true and undisputed: On May 3, 2014, in the early afternoon, there was a vehicle accident involving Brian Kleckner and Lanny Smith. Directly before the accident, Brian Kleckner was driving his motorcycle behind Lanny Smith's vehicle on Highway 64 between Sabula and Miles, Iowa. The accident occurred when Lanny Smith turned left toward his driveway, which

1

was on the left-hand side of the road. After Lanny Smith began his left turn, Brian Kleckner collided with the side of Lanny Smith's vehicle. Prior to the collision Kleckner had switched lanes in an attempt to pass Lanny Smith's vehicle. At the time of the accident Lanny Smith was working as a rural postal carrier for the United States Postal Service. The stipulations are contained in the final pretrial order. (Doc. 22.) I find all of the foregoing to be facts of the case.

## II. FURTHER FINDINGS OF FACT

On May 3, 2014, Mr. Kleckner was traveling west on Iowa State Highway 64 on his 1978 Harley-Davidson motorcycle. Mr. Kleckner is an experienced motorcycle driver. He normally drives at a leisurely pace, typically under the speed limit. At the location of the collision, the posted limit is 55 miles per hour. He was on his way to meet friends in nearby Miles, Iowa. He had no set meeting time and was in no particular hurry when he encountered Mr. Smith's vehicle also pointed westbound, but on the right shoulder near a mailbox. What happened from the time Mr. Kleckner saw Mr. Smith's modified Chevrolet Aveo[1] until they collided is the subject of this dispute.

Before the collision, Mr. Smith was engaged in delivering mail on his rural postal route. Mr. Smith calculated he had delivered mail on this route more than 8000 times since 1988 without having been responsible for any accident, even though the quirks of

---

[1] Mr. Smith's vehicle bears some description. Right-hand drive vehicles have become uncommon, at least for rural mail carriers, because of their cost and the difficulty replacing parts. In addition, the days of front bench seats in passenger cars are behind us. Rural mail carriers use their personal vehicles to deliver mail. Mr. Smith used a four-door Chevrolet Aveo sedan for his route. He modified this vehicle by removing the center console. When he delivers mail, he sits half on the driver's seat and half on the passenger seat so he can reach mailboxes through the passenger window and still operate the car. He also removes the rearview mirror from the center of the windshield because it is in his line of vision and would pose a danger to him in the event of an accident. (Tr. at 65.) He relies instead on the rearview mirror on the driver's door. The mirror on the passenger door is folded in (and thus inoperable) to avoid colliding with mailboxes.

the route, the poor roads and the hilly terrain make it one of the more hazardous routes in the postal system. Mr. Smith had been personally involved in the provision of safety training within the postal system.

Defendant's Exhibit I depicts the scene of the accident as viewed from the east. Mailbox 57618 marks the location where Mr. Smith was delivering mail when Mr. Kleckner first saw him. This mailbox belongs to Ruby Brauthower and was referred to throughout the trial as "Ruby's mailbox." The next mailbox, 57309, happened to be Mr. Smith's personal mailbox. This coincidence is significant. Mr. Smith reaches the halfway point of his route about mid-day at his residence and stops there for lunch. Although he owns a mailbox, Mr. Smith has no reason to deliver mail to it. Instead, he was turning left into his driveway on the south side of Highway 64 to take his lunch break at the time of the collision. In fact, the aftermath of the collision left both vehicles at the end of Mr. Smith's driveway, near the shoulder of the south side of the road.

Exhibit I also depicts the double yellow line that signifies a no-passing zone that extends from some point east of where Mr. Kleckner first saw Mr. Smith's vehicle to some point west of Mr. Smith's driveway. The westbound no-passing zone was necessitated by the hill that crests just to the west of Mr. Smith's driveway. In other words, westbound vehicles are prohibited from passing in this area because they are unable to see approaching vehicles in the eastbound lane. Exhibit M contains as-built elevations and a plan view prepared by the Iowa Department of Transportation of the relevant area.

The parties dispute what happened immediately before the collision. Mr. Kleckner testified that when he first saw Mr. Smith's vehicle, "[Mr. Smith] was pulled off to the right, sitting by a black mailbox." (Tr. at 18.) "[Mr. Smith] started proceeding forward. Half on the road, half off the road. He come up to the next mailbox." (*Id.*) Mr. Kleckner testified he recognized the vehicle as a mail delivery vehicle. He also testified that it had

its right turn signal on continually. (*Id*. at 18-19.) Mr. Kleckner testified "[Mr. Smith] proceeded to another mailbox, and then he hit his brakelights. I assumed that he was pulling over to that mailbox." (*Id*. at 19.)

Mr. Kleckner testified that he saw no oncoming traffic and proceeded to go around Mr. Smith's vehicle by crossing the double yellow line to the far (i.e., south) side of the eastbound lane. Mr. Kleckner believes he was traveling 45-miles-per-hour before starting to pass, but had slowed to 35-to-40-miles-per-hour as he commenced to pass Mr. Smith. Mr. Kleckner testified he saw Mr. Smith's brakelights as Mr. Smith continued to slow down to stop. Mr. Kleckner believed he was halfway or three quarters of the way around Mr. Smith when Mr. Smith turned to the left. Mr. Kleckner claims he tried to go left to avoid the accident because going right would have made him hit the rear of Mr. Smith's vehicle. (Tr. at 21.) Mr. Kleckner said he did not use his brakes because he was on gravel and would have lost control of his vehicle. Instead, he believed it was safer to downshift and he did so.

Mr. Kleckner collided with the driver's side of Mr. Smith's vehicle. The vehicles came to rest parallel to one another in the entrance of Mr. Smith's driveway on the south side of the road. (Exs. R, S.) Mr. Kleckner contends that immediately after the accident, Mr. Smith approached the injured Mr. Kleckner and expressed his consternation that drivers assume he would drive to his own mailbox.[2] Mr. Kleckner did not know Mr. Smith at the time and, presumably, had no reason to know Mr. Smith's residence was the next stop on his route. Mr. Kleckner testified Mr. Smith did not have his left turn signal on and would not have passed him if he had seen his left turn signal. The distance

---

[2] The parties disputed whether Mr. Smith used a particular expletive in addressing Mr. Kleckner. The salient feature of this remark is not the exact wording or the use of the expletive. Rather, Mr. Smith's comment tends to show he had prior experience with being passed on this stretch of roadway. This is also some evidence of the assumption a driver may make when encountering Mr. Smith; i.e., that he will continue to the next mailbox.

from Ruby's mailbox where Mr. Kleckner first saw Mr. Smith to Mr. Smith's mailbox is approximately .2 miles.

Mr. Smith describes the events differently. Mr. Smith was exact in his descriptions of the accident, as well as in his description of his habits and practices on his mail route, and his safety consciousness. He described his actions from the time he placed mail in Ruby's box,

> While signaling right at her box, I made her delivery. And in separating my delivery duties from my driving duties, I'm done with my delivery duty at her box when I know what the next delivery will be. In this case, it's always the next delivery will be my mail, which is there at the bottom of the tub. Then I looked to the west, see if it's clear coming from that direction. And then I looked through the windows over my left shoulder to see what is coming in this curve where it occurs off to the southeast. And when it's clear from both directions, I signal left and come out and take full possession of that lane of travel. I travel on the gravel only in an approach to a mailbox, and I'm certainly not approaching a mailbox here. I'm approaching my dinner site. So this entire distance from Ruby's to Lanny Smith's dinner site, it will be a left-hand turn signal, and it will be a vehicle – Whether it's obvious to anyone it's a rural carrier vehicle or not, it will be a mail delivery vehicle that's traveling in the full lane of highway, not on the gravel.

(Tr. at 69:20 – 70:19.)

Mr. Smith described his vehicle as having "crisp blinkers," by which he means the turn signal stays on until the turn is completed and the steering wheel is straightened. (Tr. at 71.) Mr. Smith testified that his left turn signal was on his entire journey from Ruby's mailbox to where the accident occurred. In fact, when law enforcement officers were investigating the accident, they inspected his lights. When he turned his key on, the left turn signal was still blinking. (Tr. at 72.) Mr. Smith testified that he believed he did not see Mr. Kleckner who "was hidden in that door post between the back window and the straight side window and that our speeds were matched." (Tr. at 74.) In any event, Mr. Smith did not see Mr. Kleckner either in his rearview mirror or when he

turned his head to look. Mr. Smith estimated that his speed got up to 35-to-40-miles-per-hour. (Tr. at 90.) He slowed to make his turn into his driveway. (Tr. at 97.) Mr. Smith testified that quite often, before this accident and thereafter, he had been passed at his mailbox with his left turn signal on. (Tr. at 100.)

Defendant offered deposition transcripts of two people who live in the general vicinity, Allan Milder and Roy Rathje. (Exs. B, C.) Neither person witnessed the accident or Mr. Smith's driving on the day of the accident. Mr. Milder testified that on the portion of Mr. Smith's route between Ruby's house and his own, he has seen Mr. Smith drive wholly on the roadway and not on the shoulder. (Ex. B at 6.) Mr. Rathje testified that whenever he saw Mr. Smith driving between Ruby's house and his own, Mr. Smith would be driving on the highway. (Ex. C at 7.)

Dr. Alan Lynch was called by Defendant to testify as an accident reconstructionist. Dr. Lynch is a registered professional engineer in the State of Iowa, has a Ph.D. in the field of mechanical engineering, and has significant experience in the area of motor vehicle accident reconstruction as set forth in Defendant's Exhibit Q. After describing his investigation, including viewing the scene of the accident, inspecting the vehicles, and reviewing pertinent records, he offered his opinions regarding the cause of the collision. First, Mr. Kleckner's motorcycle crossed the double yellow no passing zone line and, second, Mr. Kleckner failed to maintain control of his vehicle. Dr. Lynch relied on two provisions of the Iowa Civil Jury Instructions. First, Iowa Civil Jury Instruction 600.19 which is based on Iowa Code Section 321.304 provides,

> No vehicle shall overtake and pass another vehicle, or at any other time be driven to the left side of the road under the following conditions: . . . 3, Where official signs are in place directing that traffic keep to the right, or distinctive centerline or off-centerline is marked which directs traffic as declared in the sign manual adopted by the Department of Transportation.

As is clear from the record, Mr. Kleckner now admits that he crossed the double yellow no-passing zone line and was attempting to pass in violation of Iowa Code Section 321.304. Dr. Lynch opined that as while passing Mr. Smith, Mr. Kleckner would not have had adequate visibility to see vehicles approaching in the westbound lane beyond the crest of the hill. This was clearly demonstrated using the Iowa Department of Transportation elevations shown in Exhibit M and the minimum passing sight distances paving marking standards shown in Defendant's Exhibit K. In essence, Dr. Lynch's testimony confirmed the necessity of a no-passing zone in this area because of a blind spot for westbound drivers created by the hill crest. Dr. Lynch also measured the distance from Ruby's mailbox to the centerline of Mr. Smith's driveway to be 986 feet or about 0.2 miles. (Tr. at 137.)

With respect to his conclusion that Mr. Kleckner failed to maintain control of his motorcycle, Dr. Lynch found it significant that the damage marks on Mr. Smith vehicle were all behind the driver's seat which indicated that first impact occurred at the driver's side rear door panel. (Tr. at 140.) Dr. Lynch opined that "[a]ny time there is a rear impact, vehicles behind the driver are expected and always anticipated to maintain control of their vehicle." (Tr. at 144.) Dr. Lynch relied on Iowa Civil Jury Instruction 600.7, which is based on *Matuska v. Bryant*, 150 N.W.2d 716 (Iowa 1967), and provides, "A driver must have his or her vehicle under control. It is under control when the driver can guide and direct its movement, control its speed and stop it reasonably fast. A violation of this duty is negligence."

The parties' explanations of events differ on key points. Each points to inconsistencies in the other's position or other reasons to doubt the other's version of events. For example, Mr. Kleckner asserts that the "more likely" explanation for drivers repeatedly passing Mr. Smith near his driveway is that he has his right turn signal on and is traveling on the shoulder. (Doc. 28 at 8.) I cannot agree. I find Mr. Smith's testimony

credible regarding his great attention to safety on his route. It is unlikely that Mr. Smith, with his prior experience of being passed near the hill crest, would be lax when approaching this known hazard — so lax as to leave his right turn signal on for almost a quarter mile and drive on the shoulder. I think it more probable that drivers who pass him, perhaps including Mr. Kleckner, make faulty assumptions when they encounter Mr. Smith at this location. They may assume Mr. Smith intends to deliver mail to the next mailbox.[3] They may even assume he has inadvertently left his left turn signal on and ignore that warning. In any event, there is no reason to find Mr. Kleckner's proffered explanation more believable.

Defendant, in turn, points to inconsistencies in Mr. Kleckner's testimony and other reasons that his version of events should not be believed. At trial, Mr. Kleckner admitted he accelerated to pass Mr. Smith. (Tr. at 41.) However, in his deposition, he denied accelerating and, in fact, stated, "There was no sense, you know, to increase your speed." (Tr. at 42.) At trial, and in his deposition, Mr. Kleckner ultimately admitted he was attempting to pass Mr. Smith despite the double solid yellow line. However, in response to a request for admission from Plaintiff, he initially denied "attempting to pass USPS driver on left against double solid yellow line and that Brian Kleckner crossed that double yellow line to pass the driver." (Tr. at 25.)

Mr. Kleckner has admitted in his pretrial deposition that he had memory problems before the accident. (Tr. at 28.) He also testified that since suffering six skull fractures in an accident[4] he has "trouble remembering quite a bit" and his memory "wasn't the best to begin with." (Tr. at 27-28.) In fact, Mr. Kleckner characterized his memory as "terrible." (Tr. at 29.)

---

[3] After Mr. Smith hit the brakes, Mr. Kleckner "assumed [Mr. Smith] was pulling over to that mailbox." (Tr. at 19.)

[4] The record is not entirely clear as to when Mr. Kleckner suffered the six skull fractures, but it seems they resulted from the May 2014 accident. (Tr. at 28; Ex. A, p.3.)

Defendant also attempts to cast doubt on Mr. Kleckner's testimony that Mr. Smith was driving halfway on the shoulder. Defendant asserts that if Mr. Smith was driving half on the shoulder as depicted in Exhibit N, Mr. Kleckner would not have needed to move to the far side of the eastbound lane to go around him. Mr. Kleckner would have more than 23 feet to pass Mr. Smith, if Mr. Smith was half on the shoulder. While I am not persuaded by this particular argument, I conclude that Mr. Smith was not driving half on the shoulder. Mr. Smith describes this procedure as "*verboten*," presumably by the postal service or the rules of the road. Given the distance to his house, about 0.2 miles, I find Mr. Smith was unlikely to drive in this fashion. I find more credible Mr. Smith's testimony that he took possession of the entire westbound lane as he proceeded west. In light of Mr. Smith's prior experience with being passed near his driveway, it is highly unlikely he would cross one-and-a-half lanes of traffic at this juncture. Even so, I reject Defendant's argument about why Mr. Kleckner may have moved far to the left. If Mr. Kleckner had passed a vehicle traveling fully in the lane of traffic *or* half on the shoulder (e.g., a postal carrier, slow-moving agricultural equipment, or even a bicycle), it seems reasonable for him, as a motorcycle driver, to skirt that vehicle as far as possible by traveling the on the left side of the oncoming lane. Nevertheless, I conclude Mr. Klecker went to the far side of the eastbound land to pass Mr. Smith who was fully in the westbound lane.

Defendant also offered the small claims judgment and transcript of the proceedings wherein Mr. Smith was the plaintiff and obtained a judgment against Mr. Kleckner for damage to his vehicle. (Exs. E, F, G.) Defendant pointed out that Mr. Kleckner had many opportunities at that trial to deny his own fault and cast blame on Mr. Smith but failed to do so. In his defense, Mr. Kleckner points out his attorney was unable to attend that hearing and the small claims judge refused his request for a continuance. While Mr. Kleckner offered very little evidence of his educational or employment background, he

does not appear to be experienced in legal matters. While I would not anticipate a sophisticated cross-examination of Mr. Smith at the small claims trial, I do find it somewhat inconsistent with his current position that Mr. Kleckner did not assert that Mr. Smith was to blame or at least deny his own responsibility for the damages.

Defendant also offered into evidence Exhibit H, the sentencing order from the Iowa District Court for Jackson County convicting Mr. Kleckner of unsafe passing and fining him a $100 plus court costs and surcharge. I reserved ruling on the admissibility of Exhibit H and now sustain Plaintiff's objections to its admission. Although a trial was held on this misdemeanor charge, Exhibit H contains no statements from Mr. Kleckner and he did not plead guilty. Given the relatively insignificant fine he faced and the possibility he was unrepresented by counsel, I would give this evidence of his conviction little weight if I did admit it.[5] In any event, Mr. Kleckner ultimately admitted he had crossed the double yellow line in an effort to pass. Therefore, the record of his conviction for the criminal offense would be cumulative.

I have considered all of these inconsistencies and possible reasons to doubt the witnesses' testimony in reaching my conclusions below.

---

[5] 6 Handbook of Fed. Evid. § 801:17 (8th ed. 2016-2018) states:

> The rationale expressed by the Advisory Committee is excluding convictions for crimes punishable by imprisonment for no more than one year from the operation of Rule 803(22) is extremely telling:
>> Practical considerations require exclusion of convictions of minor offenses, not because the administration of justice in its lower echelons must be inferior, but because motivation to defend at this level is often minimal or nonexistent.
>
> The rationale for excluding a prior conviction after trial for a minor offense applies with even greater force to a guilty plea entered to a minor offense. Accordingly, a plea of guilty to an offense punishable by imprisonment for no more than one year should be declared to fall outside the breadth of both Rules 801(d)(2)(A) and 804(b)(3).

### III. CONCLUSIONS OF LAW

#### A. *Jurisdiction*

Having reviewed Plaintiffs' Complaint and Defendant's Answer, and having heard the testimony at trial, I find the following conclusions are not in dispute or the evidence at trial clearly established them to be true: This action is brought against the United States which is a proper party pursuant to the Federal Tort Claims Act, 28 U.S.C. Section 2671. Plaintiffs submitted administrative claims for their injuries they claim because of a May 3, 2014, motor vehicle accident, which the United States received no later than May 2, 2016. On June 22, 2017, the United States Postal Service denied Plaintiffs' claims. Plaintiffs filed their Complaint in this matter on December 12, 2017; that is, the Complaint was filed within six months of the denial as required by 28 U.S.C. Section 2401(b) and 39 C.F.R. Section 912.9 (a). The accident that is the subject of this action occurred in Jackson County, Iowa, which is in the Northern District of Iowa. Therefore, I find that this Court has personal and subject matter jurisdiction over the claims and that venue is appropriate in the Northern District of Iowa.

#### B. *The negligence claims*

Plaintiffs' complaint listed five specifications of negligence that they attribute to Mr. Smith and that they claim caused the collision:

    A. Failing to have his vehicle under control;
    B. Failing to properly signal;
    C. Failing to keep a proper lookout;
    D. Failing to yield; and
    E. Failing to act as a reasonable driver under the circumstances then and there existing.

(Doc. 1, ¶ 14.) However, in their post-trial brief, Plaintiffs have narrowed their assertions with respect to Mr. Smith's negligence. First, Plaintiffs allege Mr. Smith was negligent in failing to activate his left turn signal. Second, Plaintiffs allege Mr. Smith was negligent in failing to keep a proper lookout and failing to have a rearview mirror.

## C.    *Failure to signal*

Iowa Code §321.315 states, "A signal of intention to turn a right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning when the speed limit is forty-five miles per hour or less and a continuous signal during not less than the last three hundred feet when the speed limit is in excess of forty-five miles per hour." A violation of this law is negligence. Iowa Civ. Jury Instr. 600.33. I find Mr. Smith's testimony on the issue of his use of turn signals to be credible. In general, Mr. Smith seems deeply concerned about safety on his route. His concern seems to have been heightened along the stretch of Highway 64 between his last delivery and his driveway because of prior incidents and, therefore, he is careful to signal his left turn. Mr. Smith's driveway entrance is unfortunately located. Westbound drivers who encounter Mr. Smith delivering mail to his neighbor Ruby may be inclined to make assumptions about his intentions. They may, for example, assume he is traveling to the next mailbox. They may also ignore his left turn signal, assuming he inadvertently left it on after entering the roadway. I find credible his testimony that after the accident his left turn signal was still engaged when his lights were inspected by law enforcement officers. I conclude Plaintiffs have not met their burden of proof in establishing Mr. Smith failed to signal his turn into his driveway.

## D.    *Failure to keep proper lookout and failure to have a rearview mirror*

*Jesse v. Wemer & Wemer Co.* held,

> A proper lookout is common law duty placed upon everyone operating a motor vehicle upon the highways of this state. This duty, under the best authorities and most sound reasoning, requires a lookout not only to the front and sides but also to the rear, with the question as to its being a proper or sufficient lookout determined by the particular surrounding circumstances as revealed by the evidence then under consideration.

82 N.W.2d 82, 86 (1957) (citing *Clayton v. McIlrath*, 44 N.W.2d 741 (Iowa 1950);
*Brewer v. Johnson, Iowa*, 72 N.W.2d 556 (Iowa 1956)).

Here, Plaintiffs have not proved Mr. Smith failed to maintain a proper lookout. It may be obvious, but Mr. Smith would not have made his turn if he had seen Mr. Kleckner somewhere near him in the eastbound lane. The fact that Mr. Smith did not, in fact, see Mr. Kleckner does not mean he was negligent in his failure observe him. I credit Mr. Smith's testimony regarding the care he takes to "clear the lanes" before entering the roadway, as well as the efforts he makes while approaching his driveway to look behind him both directly and in his rearview mirror.

> Iowa Code Section 321.437 addresses the necessity of a mirror to view to the rear:

> Every motor vehicle shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least two hundred feet to the rear of such vehicle. Any motor vehicle so loaded, or towing another vehicle in such manner, as to obstruct the view in a rear view mirror located in the driver's compartment shall be equipped with a side mirror so located that the view to the rear will not be obstructed; however, when such vehicle is not loaded or towing another vehicle the side mirrors shall be retracted or removed.

Nothing about this provision requires a mirror to be located in the center of the front windshield. In fact, this code provision expressly contemplates the use of a side mirror when the vehicle is "so loaded . . . as to obstruct the view in a rear view mirror located in the driver's compartment." The evidence showed that Mr. Smith's vehicle was equipped with a functioning mirror on the driver's side of the vehicle. Plaintiffs offered no evidence tending to show it was not "so located as to reflect to the driver a view of the highway for a distance of at least two hundred feet to the rear." Mr. Smith testified credibly, "I slip the rearview mirror off the middle of the windshield, because that's in the line of vision." (Tr. at 65.) He also testified, "The one that's in the middle of the windshield is only going to scalp you in an accident and obscure your vision

totally." (Tr. at 67.) I conclude Mr. Smith's removal of his center rearview mirror and his concomitant reliance on his driver's side mirror were not negligent.

### E.     *Plaintiff Brian Kleckner was at least 51% at fault*

At trial, Defendant moved for a judgment on partial findings. F. R. Civ. P. 52(c). In response to that motion and in their post-trial brief, Plaintiffs make an interesting, but ultimately unavailing, argument based on the Iowa Supreme Court's adoption of the Restatement (Third) of Torts Section 29 as stated in *Thompson v. Kaczinski*, 774 N.W.2d 829, 838 (Iowa 2009). Defendant did not address this issue.

*Thompson* adopted the Restatement of Torts (Third) "risk standard" to clarify the scope of liability in negligence cases. Thus, "an actor's liability is limited to those physical harms that result from the risks that made the actor's conduct tortious." *Id.* (citing Restatement (Third) of Torts § 29). Plaintiffs posit that the danger posed by passing in a no-passing zone arises solely from oncoming traffic. Because Mr. Kleckner's injuries did not result from a collision with oncoming traffic, Plaintiffs reason, the cause of the collision was outside of the zone of danger that made Mr. Kleckner's passing negligent. Plaintiffs further reason that Mr. Kleckner cannot, therefore, be held liable for his injuries.

Colliding with oncoming traffic is the obvious risk, but not the only one, presented by these facts. The scope-of-liability issue is fact-intensive and *Thompson* adjures courts to

> consider all of the range of harms risked by the defendant's conduct that the jury could find as the basis for determining [the defendant's] conduct tortious. Then, the court can compare the plaintiff's harm with the range of harms risked by the defendant to determine whether a reasonable jury might find the former among the latter.

*Id.* A less obvious risk of passing in a no-passing zone is that the vehicle being passed will slow to make a left-hand turn. The driver of the turning vehicle will understandably

focus attention on potentially approaching vehicles. In this case, Mr. Smith testified regarding the surprises he has encountered, especially as his vehicle approached the crest of the hill. The question posed by *Jesse* is whether Mr. Smith's lookout was proper or sufficient under these particular circumstances. 82 N.W.2d at 86. I have already found Mr. Smith maintained a proper lookout. I now find that Mr. Kleckner was in Mr. Smith's blind spot when Mr. Smith turned to look or checked his mirror as circumstances permitted. One of the risks Mr. Kleckner took by passing in a no-passing zone was placing himself in an area where the driver he was passing would have difficulty seeing him and would be less likely to see him. Even though Mr. Smith clearly did not see Mr. Kleckner until after the collision, I cannot find his failure to do so negligent under the circumstances. Mr. Kleckner, by contrast, was negligent in placing himself in this literal "zone of danger;" i.e., the area in Mr. Smith's blind spot where Mr. Smith would be less likely to see him.

Another risk Mr. Kleckner took by passing in a no-passing zone was the urgent necessity to return to the westbound lane before he reached the crest of the hill at the very latest. Mr. Kleckner's attempt to pass placed him in Mr. Smith's blind spot. It also placed him in a position where, within a quickly diminishing distance, he would have to pass Mr. Smith to reenter the westbound lane or slow down to get behind him. Thus, I find Plaintiffs' argument based on *Thompson* unavailing. In other words, Mr. Kleckner may be held liable for the physical harm resulting from the risks that made his conduct tortious; that is, passing against the double yellow line.

Moreover, Mr. Kleckner failed to have his motorcycle under control. A driver has his or her vehicle under control "when the driver can guide and direct its movement, control its speed, and stop it reasonably fast." Iowa Civ. Jury Instr. 600.7. Having commenced to pass Mr. Smith under these circumstances, Mr. Kleckner essentially abandoned any hope of guiding his vehicle back into the westbound lane behind Mr.

Smith or stopping behind Mr. Smith.  Thus, I conclude Mr. Kleckner's failure to maintain control of his motorcycle contributed to the collision and Plaintiffs' resulting damages.

Even if some percentage of fault could be attributed to Mr. Smith for failing to maintain a proper lookout, failure to yield or any of the other specifications of negligence set forth in Plaintiffs' complaint, I nevertheless conclude that Mr. Kleckner's own negligence is at least 51% of all fault that may have contributed to the collision.  In other words, Mr. Kleckner's contributory fault is "greater in percentage than the combined percentage of fault attributable to" Defendant.  Iowa Code §668.3(1)(b).  Therefore, Mr. Kleckner's contributory fault bars Plaintiffs' recovery.  *Id.*

### *IV.    CONCLUSION AND RULING*

For the reasons set forth herein, Judgment shall enter in favor of Defendant United States of America and against Plaintiffs Brian Kleckner and Juanita Kleckner.  The costs of this action are assessed to Plaintiffs.

IT IS SO ORDERED.

DATED this 19th day of July, 2019.


_____
Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa